UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Thomas Jay White, | ) | Civil Action No. 5:21-3339-KDW |
| Plaintiff, | ) | |
| vs. | ) | |
| Kilolo Kijakazi, Acting Commissioner of Social Security Administration, | ) | ORDER |
| Defendant. | ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local

Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's

petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying

his claim for Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the

Act"). Having carefully considered the parties' submissions and the applicable law, the court

affirms the Commissioner's decision for the reasons discussed herein.

I.    Relevant Background

A.    Procedural History

On February 15, 2019,[1] Plaintiff protectively filed for SSI alleging he became disabled on

February 17, 2018. Tr. 249. After being denied initially, Tr. 127, and upon reconsideration, Tr.

147, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 164. The ALJ

conducted a hearing on May 15, 2020. Tr. 36-62. The ALJ denied Plaintiff's claim in a decision

---

[1] Although the Application Summary is dated and references an application date of February 21, 2019, Tr. 249, based on the Disability Determination and Transmittal, Plaintiff's protected filing date is February 15, 2019, Tr. 127.

dated March 17, 2021. Tr. 15-30. Plaintiff requested review of this decision from the Appeals Council. Tr. 243-48. On August 10, 2021, the Appeals Council denied the request, Tr. 5-9, making the ALJ's March 17, 2021 decision the Commissioner's final decision for purposes of judicial review. Tr. 5. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed October 13, 2021. ECF No. 1.

B.     Plaintiff's Background

Plaintiff was born January 2, 1970 and was 48 years old at the time of his alleged onset date of February 17, 2018. Tr. 277. In his February 2019 Disability Report-Adult form, Plaintiff indicated that he completed the 9th grade, attended special education classes from 1980 to 1986, and did not complete any specialized job training, trade or vocational school. Tr. 283. Plaintiff listed his past relevant work ("PRW") as a driver for various trucking companies from June 1996 until September 2009. Tr. 284. Plaintiff indicated that he stopped working on October 1, 2016 because of his conditions which he listed as left knee, lower back, severe depression, bipolar 2 with depression, anxiety, PTSD, and right shoulder. Tr. 282. Plaintiff indicated that his conditions caused him to make changes in his work activity on September 30, 2009. *Id.* Plaintiff indicated that he was 5'9" tall, weighed 400 pounds, and his conditions caused him pain or other symptoms. *Id.*

C.     Administrative Proceedings

On May 15, 2020, Plaintiff appeared with counsel at an administrative hearing in Greenville, South Carolina and testified regarding his application for SSI. Tr. 36. Vocational Expert ("VE") Dr. Carey Washington also appeared and testified. *Id.* The hearing was conducted via telephone with Plaintiff's consent. Tr. 38-39.

1.   Plaintiff's Testimony

In response to questions from his counsel Plaintiff, when asked why he is unable to work, testified:

> I have a bad left knee that is almost bone on bone. It goes out. It goes numb. I have a herniated disc in my back that flare[s] up, now and then, and prevent[s] me from working. I can't sit for long. I can't stand for long. I have a bad right shoulder and left shoulder. I was just hospital[ized] this month, for my right shoulder, again, where I tore the ligaments. So I've re-injured my right shoulder position. I have a bad neck, where I can't turn very far. When I turn it too far, I tend to get lightheaded.
> I have PTSD. I have . . . bipolar I, with severe depression. I have panic attacks when I'm around crowds. I tend to fall into a panic attack. I do have medication for them.

Tr. 45-46.

Counsel asked Plaintiff to rate his pain level for his various impairments on a ten-point scale, "with one being minimal; ten being so severe that you require hospitalization." Tr. 47. Plaintiff testified that his knee pain was a seven, his back pain was a five, his right shoulder was eight, his left shoulder was six, and his neck pain was "about an eight or a nine." Tr. 47-48. Plaintiff stated that in a typical week he has probably four-to-five "bad days" and the pain levels he testified to were on his bad days. Tr. 48. Plaintiff stated that lying down helps to alleviate his pain, but if he is already lying down then he needs to sit up and change positions. *Id.* He stated that if he has to lie down, he will lie down "anywhere from half-an-hour to two/three hours" twice in a one day. Tr. 49. Plaintiff testified that his PTSD symptoms include "nightmares, symptoms of reliving it." *Id.* He stated his bipolar disorder "comes with anger, and then manic depression." *Id.* Plaintiff listed his current medications as Paxil, gabapentin, Seroquel, Abilify, Latuda, and Lorazepam for his back. Tr. 49-50. Plaintiff stated that he experiences the side effect of tardive dyskinesia. Tr. 50. Counsel asked Plaintiff about his insomnia and Plaintiff testified that he sleeps three-to-five hours a night and the prescribed sleep aid does not help with his insomnia issues. *Id.* Plaintiff stated that he tries not to nap during the day, but that he "live[s] sleepy." *Id.* He stated that

there are times he has to lie down because of his back or neck, and in the process he has fallen asleep. Tr. 50-51. Plaintiff testified that he lives with his stepfather and 30-year-old niece in a single-wide mobile home. Tr. 51. He stated that he does not do any household chores because of pain and his niece cooks his meals. *Id.* Plaintiff indicated that he is not involved in any social activities such as church or clubs. Tr. 51-52.

In response to questions from the ALJ, Plaintiff confirmed that in the past 15 years his only job was as a truck driver—a job he had done since 2005. Tr. 52-53. Plaintiff affirmed that he still has a driver's license and a CDL that he last renewed approximately five years ago. Tr. 53. Plaintiff stated that he did not have to take a physical to renew his CDL; his boss required only "a urine test and an eye test." *Id.* Plaintiff confirmed that he has not worked for money since February 15, 2019. *Id.* Plaintiff testified that he weighed 415 pounds and was 5'10" tall. Tr. 53. He stated that doctors have recommended knee replacement surgery and shoulder surgery. Tr. 54. Plaintiff testified that doctors never brought up that he should lose weight before having knee surgery, but they did tell him that he would need to get under 350 pounds to do an MRI of his shoulder. *Id.*

Plaintiff testified that he could stand up for two hours total in an eight-hour day. Tr. 55. Plaintiff noted that Dr. Judith Tolhurst was his "mental doctor" who he sees every three months and had last seen in December. *Id.* The ALJ asked if any of Plaintiff's doctors were doing anything about his obesity and Plaintiff replied that because he went to a free clinic, the doctors were limited in what they could do. *Id.* Plaintiff testified that when he was a truck driver the heaviest weight he lifted was 75 pounds. *Id.* Plaintiff testified that he drove a semi-truck and did both local and cross-country runs. Tr. 56. He stated that he did not have the authority to hire or fire people. *Id.*

As a follow-up, Plaintiff's counsel asked him as "one important part of being a commercial truck driver" if he still had a valid medical card. Tr. 56. Plaintiff responded that his medical card had expired and he had not tried to get another one. *Id.*

    2.  VE's Testimony

The VE described Plaintiff's past work as truck driver, Dictionary of Occupational Titles ("DOT") number 905.663-014, listed as medium but sometimes can be heavy, reasoning level of three, and specific vocational preparation ("SVP") of four. Tr. 58. The VE stated that there were no transferable skills as "everything that he did was job-specific to that work[.]" *Id.* The ALJ posed the following hypothetical:

> Assume a hypothetical individual of the claimant's age, education and work experience, limited to the full range of light; but also limited to frequent balance, stoop, kneel, crouch, and crawl; and can never climb ladders, ropes, and scaffolds; is limited to frequent interaction with the public; and is limited to [DOT] mental reasoning level 2, which is apply common sense understanding to carry out detailed, but uninvolved written or oral instructions; deal with problems involving a few concrete variables in or from standardized situations.

Tr. 58-59. The ALJ asked if such an individual would be able to perform Plaintiff's past work. Tr. 59. The VE responded that he could not, but the individual could perform the jobs of weigher, light, SVP of 2, reasoning level of 2, with 125,000 jobs available; sorter, light, SVP of 2, reasoning level of 2, with 125,000 jobs available; and ticket taker, reasoning level of 2, DOT number 344.667-010, light, with 125,000 jobs available. Tr. 59.

For his second hypothetical the ALJ asked the VE to "[a]ssume a hypothetical individual of the claimant's age, education, and work experience, limited to the full range of sedentary; but unable to maintain concentration, persistence, and pace for two-hour increments; and will miss more than four days per month, unscheduled." Tr. 60. The ALJ noted the hypothetical was derived from Dr. Judith Tolhurst's medical source statement. *Id.* The VE testified that such an individual

would be unable to perform Plaintiff's past work and "would not be able to perform any jobs, on a sustained basis, in the national economy[.]" *Id.* The VE stated that all of his opinions have been consistent with the DOT and his own experience. *Id.* Plaintiff's counsel had no questions for the VE, Tr. 60, and the hearing closed, Tr. 62.

II.     Discussion

        A.     The ALJ's Findings

        In his March 17, 2021 decision, the ALJ made the following findings of fact and conclusions of law:

> 1.     The claimant has not engaged in substantial gainful activity since February 15, 2019, the application date (20 CFR 416.971 *et seq.*).
>
> 2.     The claimant has the following severe impairments: morbid obesity, lumbar degenerative disc disease, mild shoulder dysfunction, bipolar disorder, and PTSD (20 CFR 416.920(c)).
>
> 3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can never climb ladders, ropes or scaffolds; the claimant can frequently balance, stoop, kneel, crouch and crawl; he must avoid concentrated exposure to hazards, including machinery and unprotected heights. He is limited to frequent interaction with the public and can perform jobs with mental reasoning level 2, defined as applying commonsense understanding to carrying out detailed, but uninvolved written or oral instructions, deal with problems involving a few concrete variables in or from standardized situations.
>
> 5.     The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on January 2, 1970 and was 49 years old, which is defined as a younger individual age 18-49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 416.963).

7.      The claimant has a limited education (20 CFR 416.964).

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since February 15, 2019, the date the application was filed (20 CFR 404.920(g)).

Tr. 20-21, 23, 28-29.

B.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing

considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen*, 482 U.S. at 146. n.5 (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary

sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.     Analysis

Plaintiff alleges the ALJ (1) did not explain his findings regarding Plaintiff's residual functional capacity ("RFC"), and (2) failed to properly assess medical source opinion evidence. Pl.'s Br., ECF No. 15. The Commissioner argues that substantial evidence supports the ALJ's RFC assessment, the ALJ adequately evaluated Plaintiff's subjective complaints, and the ALJ adequately evaluated the opinion evidence. Def.'s Br., ECF No. 17.

1.     The ALJ's RFC Assessment

The ALJ determined that Plaintiff had the RFC to perform light work with certain postural, environmental, mental and social limitations. Tr. 23. Plaintiff argues the ALJ failed to properly evaluate the effects of his obesity on his limitations, did not properly evaluate his mental impairments, and did not properly evaluate the severity of his pain symptoms. Pl.'s Br. 12, 16, 22. The Commissioner argues that "the ALJ captured all of [Plaintiff's] credibly established functional limitations in the RFC finding and included a narrative discussion in the decision that permits meaningful judicial review. Plaintiff's argument is nothing more than an impermissible request for this Court to reweigh the evidence, which substantial-evidence review precludes." Def.'s Br. 10.

An RFC assessment is a determination of an individual's ability to perform sustained work-related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *1. "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.* (emphasis in original). At the administrative hearing level, the ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. § 416.946. An ALJ's RFC assessment should be based on all relevant evidence and will consider the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 416.945(a)(3) and (4). Social Security Ruling 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184 at *7. The ALJ must discuss the claimant's ability to "perform sustained work activities in an ordinary work setting" on a regular work schedule. *Id.* Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

a.   The ALJ's Consideration of Plaintiff's Obesity

Plaintiff argues that the ALJ's "RFC findings fail to properly account for the impact of obesity on [Plaintiff's] physical conditions. Furthermore, the ALJ's subsequent analysis is inconsistent with the RFC assigned at step four of the hearing decision." Pl.'s Br. 12. Plaintiff asserts that although the ALJ acknowledges that obesity impacts his ability to work, the ALJ "does not explain in the RFC rationale [how] someone who weighs over 400 pounds and has a knee condition serious enough to warrant recommendation of replacement surgery could be expected to perform a significant range of light work activity." Pl.'s Br. 15.

SSR 19-2p requires that obesity be considered at each step of the sequential evaluation process. Here, the ALJ did just that. At Step Two the ALJ determined that Plaintiff's morbid obesity was a severe impairment that significantly limited his ability to perform basic work activities. Tr. 20. The ALJ also determined that Plaintiff had non-severe degenerative joint disease noting his knee impairment caused only minimal limitations as the evidence indicated "mild medial knee degenerative narrowing" and full passive range of motion. Tr. 20-21. At Step Three the ALJ discussed whether Plaintiff met Listings 1.02, 1.04, or 1.04A that address major dysfunction of a joint and disorders of the spine. In finding at Step Three that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listing the ALJ noted his duty under SSR 19-2p to consider the effects of Plaintiff's obesity "in causing or contributing to the claimant's musculoskeletal, respiratory and cardiovascular impairments." Tr. 21. The ALJ stated that he "considered the effects of obesity by finding it to be a medically determinable severe impairment and in finding that the impairments do not meet, equal or functionally equal the listings." *Id.* In discussing Plaintiff's RFC, the ALJ again considered Plaintiff's obesity, consistent with SSR 19-2p. Tr. 24. The ALJ noted Plaintiff's hearing testimony describing problems with his left knee and that he was "doing all he can for his obesity." Tr. 23-24. The ALJ noted he "considered the claimant's obesity as an exacerbating factor in combination with the other medical impairments in this case and I find that the claimant is limited to less than light activity when considering his obesity." Tr. 24. The ALJ further noted that "[r]egarding his obesity, the evidence at C5F[3] shows that the claimant was not following a nutritional plan and that

---

[3] Exhibit C5F contains April 2018 - January 2019 Progress Notes from the Free Medical Clinic of Newberry. Tr. 374-384.

he was not eating low calorie meals; he would skip breakfast, eat hot dogs for lunch and then eat pork chops for dinner. (C5F/7)." Tr. 25.

Citing to treatment notes from June 2014[4], Plaintiff contends the ALJ's RFC findings ignored key evidence of record showing he had difficulty performing routine work activities and had decreased range of motion in the lumbar spine. Pl.'s Br. 14. Plaintiff also cited to a December 2014 Disability Examination by Dr. Branham Tomarchio, where he "reported problems with his gait. It was determined that he would have difficulty lifting, carrying, and walking long distances (Tr. 354-356)." *Id.* However, the court notes that regarding Plaintiff's gait maneuvers—indicating an inability to squat, perform tandem walking, and heel or toe walking—the examiner noted that he was "not sure if this was due to obesity or decreased effort today." Tr. 355. The impression of Dr. Tomarchio was:

> Chronic lower back pain. Mr. White apparently suffers from chronic lower back pain. He does have decreased range of motion of the lumbar spine *today*. He reports having difficulty with gait maneuvers. *If his symptoms are genuine*, then he *may* have *some* difficulty with lifting or carrying very heavy objects or walking long distances. Otherwise, he should be able to sit without difficulty. He has normal fine and gross manipulative skills and can communicate without difficulty.

Tr. 355-56 (emphasis added). The ALJ noted that this examination was from a prior ALJ decision, and although he considered the prior administrative medical findings, this 2014 "physical consultative examination is too remote and also mentions a reference to the claimant's decreased effort at Exhibit 1F/4. The consultative examiner did not have the benefit of seeing the claimant's later functional testing and clinical observations at 11F. It is not persuasive as it is remote and not consistent with the totality of the evidence. (3F/3)." Tr. 25.

---

[4] Plaintiff did not provide a citation to a June 2014 treatment note.

The ALJ discussed Dr. Tolhurst's records noting Plaintiff's gait and station within normal limits except for one chart entry of "Restricted" on July 15, 2019. Tr. 26 (citing Exhibits 8F/9; 13F/1, 3; 15F2, 4). The ALJ cited to inconsistencies in the record regarding limitations related to Plaintiff's ability to ambulate and stand, but he noted that an April 16, 2019 Physical Therapy Evaluation indicated Plaintiff had no deficits in his lower extremities, full passive range of motion without catching in his left knee, and his posture was "unremarkable in standing except for his obesity[.]" Tr. 27 (citing Ex. C11F at Tr. 463-64). The evaluation also indicated that "[t]ransfers were performed independently with sit-supine but asked for assistance from supine to sit. He was able to get up from the seated position without difficulty and could get in/out of his truck in the parking lot without difficulty." Tr. 463. The assessment further noted that Plaintiff "had intact reflexes and normal neurological screening. He ambulated into the clinic with the use of an AD [assistive device] but no need for an AD when walking outside to his vehicle." Tr. 464. The court notes that this is the same evaluation cited by Plaintiff in his brief regarding a reported inability to climb in and out of his truck, sit for prolonged periods, and lift due to low back and left knee pain. Pl.'s Br. 15.

The ALJ concluded that his RFC assessment was supported by the totality of the evidence. Tr. 28. The court finds that substantial evidence supports the ALJ's consideration of Plaintiff's obesity. The ALJ did what SSR 19-2p requires. That Plaintiff points to pieces of evidence that he believes support a different outcome does not change the court's ruling. "The record simply does not demonstrate that Plaintiff's obesity, alone or together with other impairments, renders Plaintiff more limited than [his] RFC suggests, nor does it demonstrate that Plaintiff is disabled under the Act." *Weaver v. Colvin*, No. 1:10CV582, 2013 WL 3989561, at *10 (M.D.N.C. Aug. 2, 2013) *report and recommendation adopted,* No. 1:10-CV-582, 2013 WL 4768178 (M.D.N.C. Sept. 5,

2013). Accordingly, the court finds that the ALJ's consideration of the Plaintiff's obesity is consistent with SSR 19-2p.

b.   The ALJ's Evaluation of Plaintiff's Mental Impairments

Plaintiff argues that the ALJ did not properly evaluate his mental impairments. Pl.'s Br. 16. The Commissioner contends "the ALJ appropriately evaluated the effect of Plaintiff's mental health symptoms on his functioning." Def.'s Br. 13.

The regulations provide steps that must be applied in evaluating mental impairments. *See* 20 C.F.R. § 416.920a. The ALJ must follow a "special technique" to determine the severity of a claimant's mental impairments. 20 C.F.R. § 416.920a(a). Under the special technique, the ALJ first evaluates the claimant's pertinent symptoms, signs, and laboratory findings to substantiate the presence of a medically determinable mental impairment. *Id.* § 416.920a(b)(1). Then the ALJ rates the claimant's degree of functional limitation resulting from the impairment. *Id.* § 416.920a(b)(2). The rating determines whether the claimant's impairment is severe or not severe. *Id.* § 416.920a(d). The ALJ considers four broad functional areas in order to rate a claimant's degree of functional limitation: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *Id.* § 416.920a(c)(3); *see id.* Pt. 404, Subpt. P, App. 1, § 12.00C. The ALJ considers factors such as "the quality and level of [the claimant's] overall functional performance, any episodic limitations, the amount of supervision or assistance [the claimant] require[s], and the settings in which [the claimant is] able to function." *Id.* § 416.920a(c)(2); *see id.* Pt. 404, Subpt. P, App. 1, § 12.00C–H. The ratings for the functional areas consist of a five-point scale: none, mild, moderate, marked, and extreme. *Id.* § 416.920a(c)(4). SSR 96-8p provides that in assessing a claimant's mental RFC the ALJ should consider "[w]ork-related mental activities generally required by competitive, remunerative work

[which] include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." 1996 WL 374184, at *6.

Here, the ALJ determined Plaintiff had the medically determinable severe mental impairments of bipolar disorder and PTSD, but found that these impairments, "considered singly, and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.15." Tr. 20-21. As required by the regulations, the ALJ documented application of the special technique to determine whether Paragraph B criteria were satisfied. Tr. 22. Citing to Dr. Judith Tolhurst's treating records noting that Plaintiff was logical, goal directed, and with average knowledge, the ALJ found Plaintiff had moderate limitations in the area of understanding, remembering, or applying information and therefore limited his RFC to "reasoning level 2." *Id.* In the area of interacting with others the ALJ noted Dr. Tolhurst's assessment of a cooperative attitude, and he noted that Plaintiff lived with family and got along well with them. The ALJ determined, based on Plaintiff's testimony, that he had a "moderate limitation in this area as he has panic attacks and does not engage in social activities but primarily isolates at home with his family members." *Id.* The ALJ cited to inconsistencies in Dr. Tolhurst's records regarding Plaintiff's memory, attention and persistence assessments and determined that Dr. Rebekah Jackson's assessment "finding concentration persistence and pace is moderately impaired is better supported and documented on this issue." Tr. 22. The ALJ noted that based on his testimony Plaintiff is able to "navigate the community well and handles himself appropriately out in public; he is independent in caring for himself." *Id.* The ALJ found Plaintiff had a mild limitation in adapting and managing himself. *Id.*

Accordingly, the ALJ explained the evidence within the record that he relied on in assessing the severity of Plaintiff's mental impairments. These findings are further reflected in the RFC limiting Plaintiff to frequent interaction with the public and jobs with a mental reasoning level of two.

The ALJ concluded his special technique assessment by finding that "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria are not satisfied." *Id.* The ALJ also considered the Paragraph C criteria and determined the evidence failed to establish the presence of that criteria. *Id.* The ALJ concluded his Step Three analysis by stating that the limitations he identified are not an RFC assessment but are used to rate the severity of mental impairments, and that his mental RFC assessment at Steps Four and Five required a more detailed assessment. Tr. 22-23. The ALJ stated that his RFC assessment reflects the degree of limitation he found in the mental function analysis. *Id.*

Plaintiff argues that the ALJ's "RFC findings are inadequate to address [his] mental impairments." Pl.'s Br. 16. The Commissioner contends this argument lacks merit. Def.'s Br. 13. The court agrees with the Commissioner. Within the RFC assessment, the ALJ is required to include a "discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-8p. The RFC must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts such as laboratory findings and non-medical evidence like daily activities and observations. *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). In his discussion of his RFC assessment the ALJ first notes Plaintiff's hearing testimony regarding his panic attacks, depression and anger and the medication he takes for it. Tr. 23. The ALJ also cites to Plaintiff's testimony about side effects from his medications, problems with insomnia, twitches in nerve

endings, and that he is not involved in social activities. *Id.* The ALJ then goes on to discuss the objective medical evidence.

In his brief Plaintiff describes medical records documenting his mental health care including treatment notes and questionnaires from March 2018, August 2018, September 2018, November 2018, March 2019, September 2019, October 2019, and December 2019. Pl.'s Br. 16-18. Plaintiff argues that the "ALJ cited a handful of relatively benign treatment notes that showed normal objective mental status examinations (Tr. 24-25)." *Id.* at 19. In his decision the ALJ discussed Plaintiff's medical records noting that "regarding his mental health, the treatment notes from Newberry MHC from January 2019 show that the claimant had essentially normal objective mental status examination and that he enjoyed working on his truck. He has noted improvement in his sleep with Abilify. (Exhibit C8F)." Tr. 24. The ALJ cited to records in June/July 2019 that showed the following:

> [T]he claimant reported that he was somewhat stable on meds, living with family members including his father and niece, and that everyone got along well. He enjoyed fishing at times, although he was limited by physical pain. He requested an alternative to Tranxene for his panic attacks. His objective mental status examination was charted by Dr. Judith Tolhurst as essentially normal, except for his appearance. (Exhibit 13F/1).[5]

*Id.* The ALJ next referenced the October 2019 mental examination cited by Plaintiff. Tr. 24-25. From this examination Plaintiff noted that he was being seen for "persistent anxiety. His appetite was erratic and variable (Tr. 485)." Pl.'s Br. 18. The ALJ also noted Plaintiff's appearance and anxious mood, but further noted:

> While he was worried about his brother who was homeless, the record show[s] that this was situational depression, and that by December he was doing much better; he was frying turkeys for Christmas and donating them to others, and he was excited

---

[5] This treatment record is actually found at Exhibit 13F/3, Tr. 470. The court notes that Plaintiff requested an alternative to Tranxene because of the cost of the medication. *Id.*

that his brother in Indiana was doing better and was going to visit him for Christmas. (Exhibit C15F).

Tr. 25. Later in his decision the ALJ again notes that the October and December 2019 treatment records (also cited by Plaintiff) "show that the claimant's attitude was cooperative, he had logical thought processes, and he was goal directed, with intact attention, and an average fund of knowledge[.]" Tr. 26.

Going back to some of the earlier medical records, the ALJ cited to Dr. Tolhurst's August 2018 medical source statement that was also discussed by Plaintiff. Tr. 26. The ALJ found the record "partially persuasive finding no IQ problems at 4F/3 which is consistent with the totality of the evidence (4F/3); there is also a finding of mild-to-moderate problems with understanding information which is also consistent[.]" *Id.* However, the ALJ found that the portion of the opinion stating that Plaintiff has "extreme issues with concentration, persistence and pace is not consistent with the overall evidence as discussed previously. There is also no persuasive evidence of marked limitations in adaptation (4F/6) and the significant number of absences from work is not consistent with the record that shows very minimal treatment for the claimant's conditions." Tr. 26.

Plaintiff discussed a March 2019 disability questionnaire which indicated Plaintiff's symptoms were resistant to treatment, his condition is chronic, and complete remission was unlikely. Pl.'s Br. 17. Plaintiff cited to a chart in the questionnaire that rated his current mental status indicating Plaintiff had poor grooming/hygiene; labile affect; depressed, irritable, and anxious mood. *Id.* at 17-18. The ALJ cited to this same portion of the questionnaire and copied the entire chart into his decision. The ALJ noted Plaintiff had good memory, good attention/concentration, and normal thought process which the ALJ found to be "consistent with the totality of the evidence showing normal mental health examinations." Tr. 26-27. Plaintiff also cited to the portion of the questionnaire that indicated he had poor ability to complete basic

activities of daily living, relate to others, and complete both simple and complex tasks. Pl.'s Br. 18. The ALJ found the conclusion that Plaintiff "cannot complete activities of daily living or relate to others at 9F/2 is not persuasive as it is not consistent with the function by function assessment in the same report above, and the longitudinal treating chart of Judith Tolhurst, MD discussed previously." Tr. 27. The ALJ also noted that the State agency psychologist's initial assessment of moderate limitations in social interaction and concentration and persistence was consistent with the evidence, but the finding of a mild limitation in the area of understanding and remembering was "not consistent with the totality of the evidence[.]" Tr. 27.

The ALJ discussed the September 2019 Mental Medical Source Statement of Dr. Tolhurst that Plaintiff referred to in his brief. The ALJ noted that Dr. Tolhurst's statement

> precludes employment finding marked limitations in activities of daily living which is not consistent with the record and which should be afforded little weight; there is no persuasive evidence of marked concentration, persistence and pace or that the claimant would have episodes of decompensation two weeks out of every month (C14F/2). He will not miss more than 4 days of work per month (C14F/3) and there is no persuasive evidence in the physical or mental health records to support this, particularly considering the mental health records from Newberry at (C15F/2-4) and Exhibit C13F/3 where the claimant reported feeling stable on medication and going fishing.

Tr. 28. The ALJ concluded his discussion of the RFC by finding his assessment is "supported by the totality of the evidence, showing that the claimant has primarily normal mental examinations and that he is stable on medications. He lives with family members and gets along with them; he goes fishing, cooks turkey for donations, had a visit from his brother, and has endorsed benefits from medications[.]" *Id.*

Plaintiff argues that the "ALJ's reliance on normal mental status examinations to support the RFC findings at the expense of other treatment notes documenting more protracted symptoms ignores the cyclical nature of psychiatric disorders." Pl.'s Br. 19. The Commissioner disagrees

with this argument for several reasons including the fact that "the majority of the treatment notes Plaintiff cites for his argument are from 2018, well before the start of the relevant period (February 2019)[.]" Def.'s Br. 14. The Commissioner also notes that "Plaintiff relies almost exclusively on his own subjective complaints to his providers" while the ALJ looked to the objective medical evidence to support his assessment. *Id.* at 15.

As previously stated, at the administrative hearing level the ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. § 416.946. In his decision, the ALJ must build a "logical bridge" from the evidence to his or her conclusion. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016). The ALJ must consider all of Plaintiff's physical and mental impairments to determine how they affect his ability to work. *Id.* at 188. To be disabling, an impairment or combination of impairments must be so functionally limiting as to preclude any substantial gainful activity for twelve consecutive months. *See* 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 416.905(a). "[A] psychological disorder is not necessarily disabling. There must be a showing of related functional loss." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (citing *Sitar v. Schweiker*, 671 F.2d 19, 20–21 (1st Cir. 1982)). As discussed above, in making his RFC assessment the ALJ considered the same records that Plaintiff cited in his brief. While the record may have shown that Plaintiff's mental impairments fluctuated in severity over time, the ALJ adequately explained in his decision how Plaintiff's mental impairments were reflected in the RFC. Here the ALJ considered the evidence in making his mental functional assessment. The ALJ performed the special technique for assessing the severity of a claimant's mental impairments and adequately documented his evaluation of Plaintiff's mental impairments. Tr. 22-28. The ALJ provided a logical bridge between his findings and RFC determination and noted activities that support an ability to perform

21

work-related functions. Upon review of the record, the court finds that the ALJ properly assessed Plaintiff's mental RFC and his conclusion is supported by substantial evidence.

c.   The ALJ's Evaluation of Plaintiff's Pain Symptoms

Plaintiff argues that given his "documented history of back and knee pain, he would be incapable of performing light work in accord with the RFC . . . especially when his weight of 415 pounds is factored into the equation properly." Pl.'s Br. 22. To support his argument Plaintiff cites to a December 2014 consultative examination, a November 2016 MRI, and treatment notes showing he "repeatedly complained of and received treatment for back pain, knee pain, and shoulder pain (Tr. 378-380, 381-382, 384, 388, 463-465, 466, 495-496)." *Id.* at 23. The Commissioner contends "the ALJ reasonably evaluated Plaintiff's subjective complaints of pain in accordance with governing regulations and SSR 16-3p[.]" Def.'s Br. 17.

A claimant's subjective allegations of pain or other symptoms alone can never establish disability. 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.929(a); SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017). Rather, the ALJ must consider "the extent to which [statements about subjective] symptoms can reasonably be accepted as consistent with objective medical evidence and other evidence" in the record. *Id*. SSR 16-3p provides a two-step process for evaluating an individual's symptoms. First, the ALJ must determine whether the individual has a medically determinable impairment "that could reasonably be expected to produce the individual's alleged symptoms." SSR 16-3p, 2017 WL 5180304, at *3. In the second step the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities. . . ." *Id.* at *4. "In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's

22

statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.*

Here, the ALJ stated that in making his RFC finding he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSR 16-3p." Tr. 23. The ALJ described the two-step process he was required to follow, outlined Plaintiff's hearing testimony, and determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. 24. The ALJ found that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were "not fully supported" by Dr. Tolhurst's musculoskeletal charting; 2015 imaging revealing minimal spondylosis; 2016 imaging showing a "subacute compression fracture at L3 which was most likely post-traumatic or osteoporotic and most likely non-pathological, and a small central protrusion at L3-4 causing mild to moderate central canal stenosis[;]" and 2019 views of Plaintiff's left knee showing "minimal to mild medical compartment degenerative narrowing and no acute findings." Tr. 24. The ALJ specifically stated that he "considered claimant's obesity as an exacerbating factor in combination with the other medical impairments in this case and [found] that the claimant is limited to less than light activity when considering his obesity." *Id.* The ALJ described the medical records supporting his findings, and also other factors he considered in assessing Plaintiff's subjective statements. Tr. 24-28.

To support his allegations that the ALJ improperly evaluated the severity of his symptoms, Plaintiff first cited to the results of a December 2014 consultative examination. Pl.'s Br. 22. As discussed earlier in this Order, the ALJ considered that examination in his decision, but determined it was "too remote and also mentions a reference to the claimant's decreased effort at Exhibit 1F/4." Tr. 25.  The ALJ specifically discussed the November 2016 imaging study cited by Plaintiff in identifying objective medical information that did not fully support Plaintiff's statements. Tr. 24. Plaintiff also cited to treatment notes showing he "repeatedly complained of and received treatment for back pain, knee pain, and shoulder pain." Pl.'s Br. 23. The ALJ discussed all of these records throughout his decision except for an April 12, 2019 emergency room record. This record noted that Plaintiff was admitted for pain in his left shoulder from "overexertion from strenuous movement or activity, gardening and landscaping." Tr. 495. The assessment notes that Plaintiff stated he was "pulling on a tiller when he felt [his shoulder joint] pop or snap." Tr. 496. The ALJ did, however, cite to an April 16, 2019 Physical Therapy Evaluation that referenced Plaintiff's left shoulder pain and the ALJ considered that finding when making his RFC assessment. The ALJ noted that Plaintiff's "left shoulder condition, while admittedly marginal, was charted at [Exhibit] 11F/2 at full strength (5/5) but did chart some cuff weakness reflected in the ladders and hazards proscription in the RFC because there were not manipulative limitations in the bilateral upper extremities at [Exhibit] 11F/1." Tr. 28.

The court finds that Plaintiff's citation to selective evidence does not render the ALJ's decision unsupported by substantial evidence because the ALJ's decision reflects careful consideration of the medical evidence as a whole and the limitations that stem from Plaintiff's impairments. Based on the court's review of the record, the ALJ's decision complied with SSR

16-3p by providing specific reasons for his findings supported by the evidence of record—including Plaintiff's statements regarding his symptoms, and the treatment records and opinions.

### 2. Evaluation of Medical Opinion Evidence

Plaintiff asserts that the ALJ failed to properly assess medical source opinion evidence. Pl.'s Br. 23. The Commissioner contends that the ALJ adequately evaluated the opinion evidence. Def.'s Br. 19.

For benefits applications filed on or after March 27, 2017 (such as Plaintiff's), the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under the new regulations, ALJs need not assign an evidentiary weight to medical opinions or give special deference to treating source opinions. 20 C.F.R. § 416.920c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[6] Instead, ALJs consider medical opinions using five factors: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) the medical source's specialization; and (5) other factors, such as the medical source's familiarity with the other evidence in the claim or understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. § 416.920c(c). The first two factors,

---

[6] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 416.913(a)(2). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 416.913(a)(5).

supportability and consistency, are the most important in determining the persuasiveness of a medical source's opinion, and the ALJ is not required to explain the consideration of the other three factors. *Id.* § 416.920c(b)(2). The new regulations further deem certain evidence "inherently neither valuable nor persuasive." 20 C.F.R. § 416.920b(c). This includes statements on issues reserved to the Commissioner such as whether a claimant is disabled, is unable to work, or is incapable of doing past relevant work. 20 C.F.R. § 416.920b(c)(3).

a.   Opinions of Judith Tolhurst, M.D.

i.   August 2018

On August 31, 2018 Stephen Steiger, LMSW and Judith Tolhurst, M.D. completed a Mental [RFC] Questionnaire regarding Plaintiff. Tr. 367-73. They noted that Plaintiff's first contact was on September 25, 2014, he was seen once per week, and his last contact was on August 30, 2018. Tr. 367. Plaintiff was diagnosed with Bipolar II and PTSD and they noted his prognosis was "Fair." *Id.* They indicated Plaintiff's symptoms and signs included anhedonia or persuasive loss of interest in all activities; apprehensive expectation; bipolar syndrome with a history of episodic periods; decreased energy; difficulty thinking or concentrating; easy distractibility; emotional withdrawal or isolation; feelings of guilt or worthlessness; generalized persistent anxiety; mood disturbance; motor tension; pathologically inappropriate suspiciousness or hostility; perceptual or thinking disturbances; persistent disturbances of mood or affect; persistent irrational fear of a specific object, activity, or situation; recurrent and intrusive recollections of a traumatic experience; sleep disturbance; somatization unexplained by organic disturbance; thoughts of suicide; and vigilance and scanning. Tr. 368-69. The social worker and doctor indicated that Plaintiff did not have a low IQ or reduced intellectual functioning, his impairments were reasonably consistent with his symptoms and functional limitations, and his psychiatric condition

exacerbated his experience of pain or other physical symptoms. Tr. 369. In the area of Understanding and Memory they indicated Plaintiff had mild limitations in the ability to remember locations and work-like procedures, moderate limitations in the ability to understand and remember very short and simple instructions, and moderate ability to understand and remember detailed instructions. Tr. 370. In the area of Sustained Concentration and Persistence, Plaintiff was noted to have moderate limitations in the ability to carry out very short and simple instructions and in the ability to carry out detailed instructions; marked limitations in the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule and maintain regular attendance, in the ability to sustain an ordinary routine without special supervision, and in the ability to make simple work-related decisions; and extreme limitations in the ability to work in coordination and proximity to others without being distracted by them, and in the ability to complete a normal workday and work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 370. In the area of Social Interaction Mr. Steiger and Dr. Tolhurst noted that Plaintiff had moderate limitations in the ability to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. Tr. 371-72. They found he had marked limitations in the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting, and to tolerate normal levels of stress. Tr. 372. They indicated he had extreme limitations in the ability to interact appropriately with the general public or in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. 370-

72. They noted Plaintiff would need unscheduled breaks during an eight-hour workday, and his limitations considered in combination would likely produce good days and bad days. Tr. 372. They indicated Plaintiff would likely be absent from work as result of his impairments of because of necessary medical treatment more than four days per month and noted "1/2 of every month." Tr. 372-73. They indicated that Plaintiff had a medically documented history of a chronic mental disorder of at least two years' duration with the following characteristics: three episodes of decompensation within 12 months, each at least two weeks long; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would cause him to decompensate; and a current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. Tr. 373. They indicated Plaintiff could manage benefits in his own best interest. *Id.*

### ii.   September 2019

On September 9, 2019 Dr. Tolhurst completed a Medical Source Statement-Mental regarding Plaintiff. Tr. 476-78. She indicated that she began treating Plaintiff on September 25, 2014 and had last seen him on September 5, 2019. Tr. 476. She diagnosed Plaintiff with Bipolar II and PTSD with symptoms of mood swings, depression, flashbacks, invasive memories, and panic attacks. *Id.* Dr. Tolhurst indicated that Plaintiff's symptoms would interfere to the extent he would be "unable to maintain persistence and pace to engage in competitive employment." *Id.* As to the Paragraph B criteria, Dr. Tolhurst indicated Plaintiff's symptoms would cause marked impairment in his ability to perform activities of daily living, extreme impairment in his ability to maintain social functioning, and marked impairment in his ability to maintain concentration, persistence or pace. Tr. 476-77. Dr. Tolhurst further indicated that Plaintiff had experienced four

or more episodes of decompensation in one year, each lasting two weeks. Tr. 477. As to the

Paragraph C criteria, Dr. Tolhurst indicated that, in her opinion, there was medical documentation

showing Plaintiff "has a chronic disorder of at least two years' duration which has caused more

than a minimal impairment of the ability to do basic work activities"; Plaintiff had "experienced

repeated episodes of deterioration or decompensation in situations which cause[d] him/her to

withdraw from the situation or to experience an exacerbation of symptoms"; Plaintiff had a

"documented current history of at least one year of inability to function outside of a highly

supportive living situation"; and "even a minimal increase in mental demands or change [would]

be predicted to cause the patient to decompensate[.]" *Id.* Dr. Tolhurst also indicated that if Plaintiff

became employed he would likely miss more than four days per month due to psychologically

based symptoms. *Id.* She noted that Plaintiff was capable of handling funds in his best interest. *Id.*

> b.  The ALJ's Consideration of the Opinions

The ALJ considered the August 2018 opinion and made the following observations and

findings:

> There is a medical source statement in the file from August 31, 2018[ ] from Judith
> Tolhurst, MD at Exhibit 4F/7 that is partially persuasive finding no IQ problems at
> 4F/3 which is consistent with the totality of the evidence (4F/3); there is also a
> finding of mild-to-moderate problems with understanding information which is also
> consistent, but the opinion that the claimant has extreme issues with concentration,
> persistence and pace is not consistent with the overall evidence as discussed
> previously.

> There is also no persuasive evidence of marked limitations in adaptation (4F/6) and
> the significant number of absences from work is not consistent with the record that
> shows very minimal treatment for the claimant's conditions.  The finding that the
> claimant can manage money is consistent with the totality of the evidence.  (4F/7).
> The underlying treatment records at C15F from Newberry Mental Health show that
> the claimant's attitude was cooperative, he had logical thought processes, and he
> was goal directed, with intact attention, and an average fund of knowledge in
> October and December 2019.  (15F/2-4).

> There is another mental source statement from Stephen Skiger [sic] from March 2019 finding that the claimant has good memory and good attention and concentration, with a normal thought process, which is consistent with the totality of the evidence showing normal mental health examinations.

Tr. 26.  The ALJ considered Dr. Tolhurst's  September 2019 opinion and provided the following assessment:

> There is a mental medical source statement from September 2019 from Judit[h] Tolhurst, MD at 14F that precludes employment finding marked limitations in activities of daily living which is not consistent with the record and which should be afforded little weight; there is no persuasive evidence of marked concentration, persistence and pace or that the claimant would have episodes of decompensation two weeks out of every month (C14F/2).  He will not miss more than 4 days of work per month (C14F/3) and there is no persuasive evidence in the physical or mental health records to support this, particularly considering the mental health records from Newberry at (C15F/2-4) and Exhibit C13F/3 where the claimant reported feeling stable on medication and going fishing.

Tr. 28.

2.  Discussion

Plaintiff appears to take no issue with the ALJ's consideration of the September 2019 Medical Source Statement, and instead focuses on the ALJ's findings regarding the earlier August 2018 Mental RFC Questionnaire. Plaintiff states that the ALJ supported his assessment on the showing in the record that Plaintiff received only minimal treatment for his conditions. Pl.'s Br. 27-28. Plaintiff argues it is improper to penalize Plaintiff because his treatment options were limited. *Id.* at 28. The Commissioner contends "the ALJ's consideration of Plaintiff's conservative treatment when evaluating the severity of Plaintiff's mental impairments was appropriate." Def.'s Br. 22.

Here, the ALJ did not base his entire assessment of Dr. Tolhurst's opinion on Plaintiff's minimal treatment. He noted only that the "significant number of absences from work is not consistent with the record that shows very minimal treatment for the claimant's conditions." Tr.

30

26. Regarding the other portions of the opinion that the ALJ found partially persuasive or unpersuasive, the ALJ referred to his prior discussion of other evidence in the record cited in his analysis at Step Three (addressed in the previous section of this Order regarding the ALJ's application of the special technique for evaluation of mental impairments) where the ALJ noted Dr. Tolhurst's treating records.

Plaintiff cites to the Fourth Circuit decision, *Arakas v. Comm'r of SSA*, 983 F.3d 83 (4th Cir. 2020) arguing that "the ALJ failed to weigh the medical opinions using the factors in 20 C.F.R. § 404.1527(c) and failed to provide the narrative discussion explaining how specific evidence supports the varying degrees of weight assigned[.]" Pl.'s Br. 29. The court's analysis in *Arakas* refers to the treating physician rule requiring ALJs to give controlling weight to the opinions of treating physicians under certain circumstances. *Arakas*, 983 F.3d at 106-07. However the treating physician rule does not apply to claims filed after March 27, 2017. Under the new rule, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . ." 20 C.F.R. § 416.920c. Instead, under the new regulations, when discussing the persuasiveness of an opinion, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. 20 C.F.R. § 416.920c(b)(2). The ALJ's analysis comports with the new regulations as he properly considered Dr. Tolhurst's opinions including the inconsistency with her own treatment notes and other evidence of record. The ALJ also explained what portions of Dr. Tolhurst's opinion he found persuasive and what portions he found unpersuasive based on the factors of supportability and consistency.

It is not for this court to determine how it would rule on Plaintiff's claim for disability in the first instance, but rather to determine whether there is substantial evidence to support the ALJ's ruling. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Here, the ALJ reviewed the evidence,

explained the reasons for his determination, and the undersigned finds that determination is supported by substantial evidence in the record. "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations. And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. at 1154 (internal citations omitted). Accordingly, the court finds that the ALJ's evaluation of the opinion evidence is in keeping with the revised regulations and is supported by substantial evidence.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard. *See Craig,* 76 F.3d at 589; *see also* 42 U.S.C. § 405(g). Therefore, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

Kaymani D. West

October 13, 2022                                    Kaymani D. West
Florence, South Carolina                           United States Magistrate Judge